WO                NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kimberly Sue Franco,<br><br>  Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin,<br><br>  Defendant. | No. CV-14-01670-PHX-JJT<br><br>**ORDER** |

At issue is the denial of Plaintiff Kimberly Sue Franco's Title II Application for Disability Insurance Benefits by the Social Security Administration under the Social Security Act. Plaintiff filed a Complaint on July 25, 2014, asking this Court to review the denial of her benefits. (Doc. 1.) The Court has reviewed the briefs (Docs. 20, 21, 29) as well as the Administrative Record (Docs. 10, 11, 12, R.) and now affirms in part and reverses in part the Administrative Law Judge's decision (R. at 26–47) as upheld by the Appeals Council (R. at 1–6).

**I.   BACKGROUND**

The Court has reviewed the record in its entirety and summarizes the relevant portions below. Plaintiff filed a Title II Application for Disability Insurance Benefits alleging disability beginning December 31, 2010. (R. at 29, 86.) After Plaintiff's application was denied initially and on reconsideration, Plaintiff requested a hearing, which an Administrative Law Judge (ALJ) held on September 7, 2012. (R. at 48.) On September 24, 2012, the ALJ issued a decision denying Plaintiff's application. (R. at 26–47.) After the ALJ denied Plaintiff's request, the Appeals Council (AC) denied Plaintiff's

request for review of the ALJ's decision on May 27, 2014, making the ALJ decision the final decision of the Commissioner of Social Security. (R. at 1–6.) The present appeal followed.

### A. Medical Evidence
#### 1. Treating Physicians
##### a. U.S. Air Force Hospital

Plaintiff was seen at the U.S. Air Force Hospital from February 2006 to January 2011. (R. at 400–584.) Plaintiff reported constant vomiting, diarrhea, back aches, and all over body pain. (*See, e.g.*, R. at 540, 556–58, 563.) In December 2010, Plaintiff's diagnoses included the following: diabetes mellitus type two with complication, fibromyalgia, hypertension, esophagitis chronic reflux, hyperlipidemia (high levels of fat particles in the blood), and visual disturbances. (R. at 568.)

##### b. Visual Treatment

Plaintiff was seen at the Arizona Eye Institute from March 2008 to December 2010 (R. at 352–99), where it was determined she had non-specific visual field defects, but no vision loss or Horner's condition (disrupted nerve pathway) (R. at 361). Plaintiff also saw Dr. Sharon Johnstone with Neuro-Ophthalmology, but Dr. Johnstone could not diagnose Plaintiff's issues. (R. at 300, 304.) Plaintiff experienced an episode of dizziness and vision loss in May 2011, and tests conducted thereafter were normal but noted "constricted visual fields with high level of false negatives." (R. at 921, 959, 961.) Plaintiff also went to Southwest Eye Surgeons in 2011 stating she had been experiencing blurred vision and peripheral vision loss (R. at 662, 1086–90); Plaintiff was determined to have visual floaters, glaucoma suspect, and Horner's syndrome. (R. at 664, 1087.)

##### c. Banner Medical Center

Plaintiff was treated at Banner Medical facilities from January 2009 to August 2012. (*See* R. at 668–807, 848–951, 986–96, 1091–169, 1229–67, 1296–306, 1327–77.) During this time, Plaintiff complained of nausea, vomiting, abdominal pain, multiple

sclerosis (MS) flare ups, visual disturbances, palpitations, fatigue, and muscle weakness. (*See* R. at 1350–77.)

In January 2011 Plaintiff underwent testing of her chest, abdomen, and pelvis, and results were normal except for hepatomegaly, splenomegaly (abnormal enlargement of the spleen), and a cyst on the right ovary. (R. at 715–18, 721–23.) On July 27, 2011, Plaintiff underwent an MRI of the brain, which was normal. (R. at 983.) She also had an MRI of the cervical spine that showed normal results. (R. at 984.) Plaintiff's MRI of the spine showed no acute abnormalities within the thoracic spine or cord and no cord compression, but the MRI did show vertebral hemangioma (vascular tumor) within T8 vertebra. (R. at 985.) Plaintiff's MRIs of the spine and brain dated October 6, 2011 were also normal. (R. at 1098, 1100.)

A number of doctors saw Plaintiff in October 2011, all of whom recognized that Plaintiff's symptoms suggested MS, but they did not appear to provide a clear diagnosis of such. (*See, e.g.*, R. at 1126, 1128.) Dr. Paul Kowalski examined Plaintiff in October and found Plaintiff has quadriparesis (muscle weakness). (R. at 1091–92.) Dr. Kowalski referred Plaintiff for further steroid treatment, MRIs, and physical therapy. (R. at 1092.)

Plaintiff went to the emergency room in January 2012 after she passed out and was experiencing headaches, dizziness, and chest pain. (R. at 1229, 1235.) She underwent various tests, none of which showed significant medical issues or clearly pointed to the reason for her symptoms. (*See* R. at 1233, 1243–44, 1252–67, 1341.) In August 2012, Plaintiff called the paramedics because she felt she was experiencing a MS flare up and numbness. (*See* R. at 1364.)

### d. Dr. Hagevik

Dr. Andre Hagevik first treated Plaintiff in March 2011 after Plaintiff experienced an episode of vision loss, dizziness, and disorientation, which may have been a stroke (R. at 680, 686), and he continued to treat Plaintiff thereafter (*see* R. at 979–85, 1043–47, 1217–26). Plaintiff went to the emergency room and underwent a chest x-ray (R. at 670), CT scan of the head/brain (R. at 673), MRI of the brain (R. at 675), MRI of the cervical

spine (R. at 677–78), and spinal tap to determine MS, all of which were unremarkable. (R. at 680, 980.) Dr. Hagevik stated Plaintiff's symptoms were largely consistent with MS. (R. at 682.) He reported Plaintiff's visual test showed normal results and there were no clear signs of Horner's syndrome. (R. at 682, 701.) Plaintiff stated she felt her episodes of visual loss, feeling faint, and feeling dizzy were becoming more frequent and prolonged. (R. at 681.)

Dr. Hagevik later diagnosed Plaintiff with fibromyalgia (R. at 982) and noted her previous tests to determine MS, including a spinal tap, an MRI and other "workup," were negative. (R. at 980–81.) He did acknowledge that Plaintiff previously responded positively to steroid treatment for her MS symptoms. (R. at 981.) Dr. Hagevik noted Plaintiff continued to experience numbness, weakness, and difficulty with peripheral vision. (R. at 981.) He concluded that while Plaintiff experiences visual changes, she did not have specific visual conditions. (R. at 982.)

In August 2011, Dr. Hagevik conducted studies including a motor nerve study, a sensory nerve study, and an EMG study. (R. at 1045–47.) Despite these studies and others, Dr. Hagevik was still unable to determine the reason for Plaintiff's symptoms, stating that while her symptoms did suggest MS, MRIs of the brain and spine, blood work, and the MS panel were unremarkable. (R. at 1045.) He also did not find evidence of optic neuropathy. (R. at 1045.)

In September 2011, Dr. Hagevik conducted a medical assessment of Plaintiff's ability to do work-related physical activities and determined she could not work a full-time job on a regular basis due to her vision issues and lower back pain. (R. at 1084.) He found Plaintiff could sit for more than three but less than four hours, stand/walk for less than two hours, lift/carry less than ten pounds, and that she was limited in other activities including use of her feet and stooping, balancing, and crouching. (R. at 1084.) Dr. Hagevik noted Plaintiff had moderate medication side effects, and her other symptoms were moderately severe as to the extent they would limit her ability to perform

work-related activity. (R. at 1085.) He indicated that his determination could reasonably be expected to result from medically-documented findings. (R. at 1085.)

Plaintiff continued to see Dr. Hagevik in 2012 regarding her numbness, visual issues, severe back pain, and symptoms that suggested MS. (*See, e.g.*, R. at 1217.) Dr. Hagevik also continued to conduct nerve studies on Plaintiff. (R. at 1225–26.)

### e. Dr. Ferenczi

Dr. Andrea Ferenczi treated Plaintiff for her diabetes. (*See* R. at 986–96.) In June 2011, Plaintiff complained of vomiting, abdominal pain, fatigue, blurred vision, palpitations, and numbness/tingling. (R. at 988, 990.) Dr. Ferenczi's assessment states Plaintiff has type two diabetes (controlled), significant peripheral neuropathy, and a possible underlying neurological disorder. (R. at 988.) In August 2012, Dr. Ferenczi completed a medical assessment of Plaintiff's work-related physical activities abilities finding she could not work eight hours a day, five days a week on a regular basis. (R. at 1227.) She also determined Plaintiff could sit less than two hours a day, stand/walk less than two hours a day, and lift/carry less than ten pounds. (R. at 1227.) Dr. Ferenczi determined it was medically necessary for Plaintiff to alternate positions every twenty minutes, she would need rest with position changes, and she was limited in her ability to use her hands and do other activities such as stooping. (R. at 1227.) Dr. Ferenczi noted Plaintiff would likely miss work four to five times a month due to her medical conditions. (R. at 1228.)

### f. Dr. Fala

Dr. Hamidulla Falla treated Plaintiff in October 2011 (R. at 1111) and from February to August 2012 (R. at 1307–26). On October 4, 2011, Plaintiff presented with extremity weakness, and Dr. Fala recommended continued medication for MS and a neurology consult. (R. at 1111, 1113, 1118–19.) Dr. Fala found Plaintiff suffered from diabetes mellitus type two (controlled), lower back pain, gastroesophageal reflux disease, hyperlipidemia, hypertension, fibromyalgia, and insomnia. (R. at 1113, 1318.)

In February 2012, Dr. Fala noted a diagnosis of MS (stable) and that Plaintiff suffered from residual weakness. (R. at 1315.) Later, however, in May 2012 Dr. Fala wrote "Multiple sclerosis?" in treatment notes and thereafter, stopped listing MS as a diagnosis, though "muscle weakness-general" was listed. (R. at 1309.)

### g. Other Medical Providers and Treatment

Plaintiff was seen at the Clinic for Digestive Diseases in 2010 and 2011. (R. at 312–51, 997–1015.) Medical imaging showed Plaintiff had degenerative disc disease (DDD), hepatomegaly and hepatic steatosis (buildup of fat in the liver), small hiatal hernia, interval complex lesion, and a redundant colon. (R. at 339–40.) Doctors noted Plaintiff dealt with chronic and persistent nausea, vomiting, and abdominal pain, but they could not determine the cause. (R. at 998, 1000, 1008, 1011, 1015.)

Plaintiff was treated at Arizona Arthritis and Rheumatology Associates from February 2010 to June 2012. (R. at 585–610, 1016–42, 1281–95.) During PA Shawna Carbonniere's treatment of Plaintiff, she conducted assessments and found Plaintiff had 18 of 18 fibromyalgia tender points, and Plaintiff was diagnosed with fibromyalgia and DDD. (R. at 590, 603, 609, 1283, 1293–94.) Doctors and physicians assistants examining Plaintiff also noted the following issues: displacement; lumbar disc without myelopathy; lesions; fatigue; dizzy spells; brachial plexus; chest pain; fatty liver; stroke not otherwise specified; lesion, lumbrosacral root, anxiety, thoracic outlet syndrome and diabetes mellitus type two. (R. at 590, 604, 609–10, 1289, 1292.) Plaintiff was put on a treatment plan of trigger point injections and medications for her fibromyalgia. (*See, e.g.*, R. at 1032–33, 1041, 1284, 1289, 1290, 1294.) During Plaintiff's treatment, tests continued to fail to confirm that Plaintiff had MS. (R. at 1038.) The following tests in 2011 were also normal: MRIs of the lumbar spine, cervical spine, thoracic spine, and brain, and CT of the chest. (R. at 1018–23, 1295.)

### 2. Examining Physician

Dr. Jeffrey Levison with the Disability Determination Services examined Plaintiff on June 16, 2011. (R. at 964–70.) Dr. Levison reviewed the medical records and

concluded that they substantiate Plaintiff's diagnoses of type two diabetes, peripheral neuropathy, fibromyalgia, neuropathy, gastroparesis, hyperlipidemia, and mild DDD in her lumbar spine. (R. at 964.) He also noted her long history of hypertension, diabetes, migraines, palpitations, vomiting, and a hole in her heart. (R. at 964.) Dr. Levinson noted that while Plaintiff had been evaluated for MS, testing did not support a diagnosis. (R. at 964.) Dr. Levinson only identified one tender point for fibromyalgia. (R. at 965.)

Dr. Levinson believed Plaintiff tends to exaggerate her degree of limitation and debilitation. (R. at 966.) He diagnosed Plaintiff with diabetes mellitus, which he found to be stable, as well as diabetic peripheral neuropathy and gastroparesis. (R. at 966.) He believed her vomiting only occurred once a week per her gastroenterology note. (R. at 966.) Dr. Levinson also noted Plaintiff's MRIs and CTs showed normal results and no other medical issues, thus making a diagnosis of MS very unlikely. (R. at 966.) While he noted that Plaintiff alleges fibromyalgia, he did not state a diagnosis, but only noted her claims of diffuse points and his finding of one tender point. (R. at 966.)

Dr. Levinson concluded that Plaintiff was subject to several limitations. (R. at 967–69.) He found Plaintiff had lifting/carrying restrictions, but could stand and/or walk for six to eight hours a day and could do activities such as stooping, kneeling, or crouching for up to two thirds of an eight-hour workday. (R. at 967–68.) Dr. Levinson also noted Plaintiff's impairments caused restrictions regarding working around heights, moving machinery, and extreme temperature. (R. at 968.) Dr. Levinson found Plaintiff had no visual limitations. (R. at 968.)

**B.     Hearing Testimony**

**1.     Plaintiff's Testimony**

On September 7, 2012, Plaintiff testified before the ALJ to the following (R. at 48, 56–77):

Plaintiff has a variety of health problems and while doctors have made some diagnoses, they have not been able to identify the source of many of Plaintiff's issues. (R. at 69.) Plaintiff was diagnosed with MS when she was twenty years old, and while

she did not experience the symptoms for twenty years, she is now experiencing them about every two months. (R. at 63.) When Plaintiff has MS "attacks" she cannot move her body, and she has been hospitalized approximately nine times in the past year. (R. at 63.) Plaintiff is treated with a steroid that helps her regain strength. (R. at 64.)

Plaintiff experiences constant pain, and her most severe pain derives from her neck and back. (R. at 65.) She also experiences numbness in her feet, hands, and arms. (R. at 66.) Plaintiff received regular trigger point injections for her pain, but they only provided temporary relief. (R. at 66.) Plaintiff has pain when she is in a variety of positions and has trouble maintaining stability. (R. at 70–71.) She has to lie down and nap every day, at least once, between the hours of eight o'clock in the morning to five o'clock in the evening due to her pain or because she falls asleep. (R. at 71, 73.)

As a result of her diabetes, Plaintiff has neuropathy, vision problems, and gastroparesis. (R. at 67.) Plaintiff often has nausea, vomiting, and diarrhea, and her vomiting incidents sometimes last six to eight hours, and she vomits every 20 minutes. (R. at 68.) Her vomiting incidents occur "a couple times a month" and she has diarrhea every day. (R. at 68–69.)

Plaintiff also has vision issues, possibly due to her MS and/or diabetes, including lack of peripheral vision, lack of depth perception, and spots and blackness in her vision. (R. at 72, 76.) This makes it difficult for her to drive, but she drives short distances, such as to her nearby doctor appointments. (R. at 58.)

With regard to Plaintiff's daily activities, she is able to do some household chores including washing dishes, doing laundry, and dusting. (R. at 75.)

### C. Plaintiff's Spouse's Function Report

Plaintiff's spouse, Robert Franco, completed a function report on August 6, 2012. (R. at 263–70.) He reported that Plaintiff cannot sit or stand for long periods of time and she aches, gets dizzy, and sometimes faints. (R. at 263.) Mr. Franco also stated Plaintiff has trouble concentrating due to her pain medications. (R. at 263.) He noted Plaintiff is sometimes able to do light housework that does not require lifting more than five pounds,

and she can help make meals, but spends much of the day resting. (R. at 264–65, 268.) While Plaintiff can mostly attend to her personal care, at times, her pain is worse and she has difficulty doing so. (R. at 264.) Mr. Franco noted Plaintiff does not go out of the house often because she is unstable when walking, but she can drive short distances and goes grocery shopping with him using her electric scooter. (R. at 266.) Plaintiff also has difficulty sleeping. (R. at 264.)

### D. The ALJ's Opinion

ALJ Thomas Cheffins issued an opinion dated September 24, 2012, in which he concluded Plaintiff was not disabled under Sections 216(i) and 223(d) of the Social Security Act. (R. at 40.) The ALJ began his decision by denying Plaintiff's request to subpoena all examining and non-examining physicians to testify. (R. at 29.) He then stated his finding that Plaintiff will meet the insured status requirement through September 30, 2016 and had not engaged in substantial gainful activity during the period from her alleged onset date of December 31, 2010 to present. (R. at 33.) The ALJ then listed insulin-dependent diabetes mellitus, peripheral neuropathy, fibromyalgia, chronic pain syndrome, gastroparesis, pancreatitis, visual loss with 20/60 corrected vision bilaterally, possible MS, and mild thoracic outlet syndrome as severe impairments afflicting Plaintiff. (R. at 33.) The ALJ found that Plaintiff's medically determinable mental impairment of depression was non-severe. (R. at 33.)

Proceeding with the five-step inquiry, the ALJ found that the impairments or combination of impairments did not meet the severity of symptoms to meet or equal any of the medical listings. (R. at 34.)

The ALJ stated his finding that Plaintiff had the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR 404.1567(a), with no or limited climbing and occasional balancing, stooping, crouching, kneeling and crawling, occasional overhead reaching, no moving machinery, and no unprotected heights. (R. at 34.) He also noted Plaintiff could work in occupations requiring no more than occasional depth perception. (R. at 34.) The ALJ found that Plaintiff's statements concerning the intensity,

1  persistence and limiting effects of the symptoms of her medically determinable
2  impairments were not credible to the extent they were inconsistent with the RFC
3  assessment. (R. at 35.)  He also found that the severity of Plaintiff's pain complaints were
4  inconsistent with her activities of daily living, her testimony at the hearing was
5  exaggerated, and she exhibited malingering behavior at a consultative exam. (R. at 36.)
6  As to the medical opinions, the ALJ gave "greater weight" to the state agency examining
7  physician Dr. Levison. (R. at 38.) He rejected the opinions of doctors Ferenczi, Hagevik,
8  and Fala. (R. at 38–39.) The ALJ gave the state agency's reviewing physicians' opinions
9  regarding the Plaintiff's RFC "some weight," but only to the extent they support a finding
10 that Plaintiff can perform a wide range of sedentary work activity. (R. at 39.) The ALJ
11 also considered statements from Plaintiff's spouse. (R. at 39.)

After determining Plaintiff's RFC, the ALJ found Plaintiff could perform past relevant work as an assistant accounting clerk, activity director/appointment clerk, and administrative assistant/secretary. (R. at 39.) The ALJ thus found Plaintiff was "not disabled." (R. at 39.)

## II.     LEGAL STANDARDS

The district court reviews only those issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). The court may set aside the Commissioner's disability determination only if the determination is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). Substantial evidence is more than a scintilla, but less than a preponderance; it is relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole. *Id.* In determining whether substantial evidence supports a decision, the court must consider the record as a whole and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.* As a general rule, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).

To determine whether a claimant is disabled for purposes of the Social Security Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). At the first step, the ALJ determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled and the inquiry ends. *Id.* At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). If not, the claimant is not disabled and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Pt. 404 (Listing of Impairments). 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. *Id.* At step four, the ALJ assesses the claimant's residual functional capacity and determines whether the claimant is still capable of performing past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If so, the claimant is not disabled and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, where he determines whether the claimant can perform any other work based on the claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* If not, the claimant is disabled. *Id.*

## III. ANALYSIS

Plaintiff raises the following arguments in her Opening Brief: (1) the ALJ failed to properly articulate sufficient reasons for rejecting medical source opinions (Doc. 20, Pl's Br. at 10) and (2) the ALJ failed to articulate sufficient reasons for finding Plaintiff not fully credible and rejecting reported symptoms and observations of Ms. Franco's spouse (Pl.'s Br. at 22).

### A. The ALJ Did Not Err in Rejecting Dr. Hagevik's and Dr. Ferenczi's Opinions but Did Err in Rejecting Dr. Fala's Opinion

Plaintiff argues that the ALJ failed to provide sufficient reasons for rejecting the opinions of treating physicians Hagevik, Ferenczi, and Fala. (Pl.'s Br. at 11.) An ALJ may only reject contradicted opinions of treating or examining sources by providing specific and legitimate reasons that are supported by substantial evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Even when contradicted, a treating physician's opinion is still owed deference and may be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Orn*, 495 F.3d at 633). An ALJ satisfies the substantial evidence requirement by providing a "'detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings.'" *Id.* (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th. Cir. 1998)). When evaluating conflicting medical opinions, if the opinion of a doctor is brief, conclusory, and inadequately supported by clinical findings, the ALJ need not accept the opinion of the doctor. *Bayliss*, 427 F.3d at 1216.

Doctors Hagevik, Ferenczi, and Fala's treating source opinions conflict with Dr. Levinson's opinion, and the ALJ must provide specific and legitimate reasons supported by substantial evidence to reject the treating source's opinions. *See Bayliss*, 427 F.3d at 1216.

#### 1. The ALJ Did Not Err in Rejecting Dr. Hagevik's Opinion

The ALJ rejected Dr. Hagevik's opinion because he found it was "based upon the claimant's subjective complaints, it is not consistent with [the] medical record and is, in fact, not supported by Dr. Hagevik's own clinical and laboratory findings, it is contradicted by opinions from examining and non-examining physicians of record, and it is inconsistent with the claimant's activities of daily living." (R. at 38.) The ALJ also stated objective test results did not support Dr. Hagevik's opinion regarding Plaintiff's limitations and restrictions. (R. at 38.)

1	The ALJ provided a specific and legitimate reason, supported by substantial
2 evidence, to reject Dr. Hagevik's opinion where the ALJ stated Dr. Hagevik's opinion
3 was not supported by the doctor's own clinical and laboratory findings. Dr. Hagevik's
4 September 2011 medical assessment states Plaintiff is not able to work full-time on a
5 regular basis due to her poor vision and lower back pain. (R. at 1084.) Although
6 throughout Dr. Hagevik's treatment of Plaintiff he noted her subjective complaints
7 regarding her vision, he also conducted and/or reviewed various visual studies that did
8 not indicate Plaintiff suffered from significant visual issues that would preclude her from
9 full time work. For example, Dr. Hagevik reported that Plaintiff's visual test showed no
10 significant abnormal results, there were no clear signs of Horner's syndrome, and that
11 while Plaintiff did have visual changes, she did not have specific visual conditions. (R. at
12 682, 701, 982.) Dr. Hagevik's medical opinion that Plaintiff cannot work due to her
13 visual issues is not supported by his treatment notes and findings, and the ALJ provided a
14 specific and legitimate reason supported by substantial evidence for rejecting his opinion.

15	The ALJ also provided a specific and legitimate reason for rejecting Dr. Hagevik's
16 opinion where his opinion is not consistent with the medical record. With regard to
17 Plaintiff's visual issues, one doctor evaluating Plaintiff indicated she had non-specific
18 visual field defects, but no vision loss or Horner's condition (R. at 361), another doctor
19 could not diagnose any specific visual issues (R. at 300, 304), and other visual testing
20 indicated normal results (R. at 921, 959, 961). There is some evidence of Plaintiff's
21 visual impairment, including one doctor's diagnosis of Horner's syndrome (R. at 664,
22 1087) and a note that Plaintiff had "constricted visual fields with high level of false
23 negatives" (R. at 921, 959, 961). However, the ALJ's reason for rejecting Dr. Hagevik's
24 opinion regarding Plaintiff's visual impairment and related limitations is supported by the
25 substantial evidence discussed.

26	With regard to Plaintiff's low back pain, Dr. Hagevik's opinion that Plaintiff could
27 not consistently work full-time due to such pain is also inconsistent with the medical
28 record. Although Dr. Hagevik notes Plaintiff's subjective complaints and DDD diagnosis,

numerous objective tests in the medical record, including MRIs of the spine, show Plaintiff did not suffer from significant lower back issues. (*See* R. at 677–78, 984–85, 1098, 1018–23). Accordingly, the ALJ also provided a specific and legitimate reason supported by substantial evidence for rejecting Dr. Hagevik's opinion as it related to Plaintiff's lower back pain.

The Court need not determine whether all of the ALJ's reasons for rejecting Dr. Hagevik's opinion are specific and legitimate where at least some of the reasons meet this standard, and any adverse finding as to the other reasons the ALJ cites would be harmless error. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008).

## 2. The ALJ Did Not Err in Rejecting Dr. Ferenczi's Opinion

The ALJ rejected Dr. Ferenczi's opinion because he found it was "based upon the claimant's subjective complaints, it is not consistent with [the] medical record, it is contradicted by opinions from examining and non-examining physicians of record, and . . . [is] not supported by Dr. Ferenczi's own clinical and laboratory findings." (R. at 38–39.) In her August 2012 medical assessment opinion, Dr. Ferenczi notes Plaintiff's work-related limitations would result from objective, clinical, or diagnostic findings documented by her or elsewhere in the medical record. (R. at 1228.) Dr. Ferenczi notes, however, that she did not consider her or others' treatment notes, records, and reports, but that the basis of her opinion was her role as Plaintiff's endocrinologist. (R. at 1228.) Dr. Ferenczi's medical assessment opinion states Plaintiff cannot regularly work full-time, and in an eight-hour workday she can sit, stand, and walk for only less than two hours. (R. at 1227.) She did not indicate what impairments/diagnoses are affecting Plaintiff's ability to function. (R. at 1227.)

The ALJ provided specific and legitimate reasons, supported by substantial evidence, to reject Dr. Ferenczi's opinion where the ALJ stated Dr. Ferenczi's opinion was not supported by the medical record and the doctor's own findings. In January 2011, Dr. Ferenczi noted Plaintiff was experiencing conditions "most likely [as] a direct result

of uncontrolled diabetes" (R. at 843), but later noted Plaintiff's diabetes was controlled. In June 2011, Dr. Ferenczi stated Plaintiff's diabetes was "very well controlled" on her treatment plan (R. at 988), and then, in May 2012, noted Plaintiff's diabetes was "optimally controlled" (R. at 1302). Dr. Ferenczi's August 2012 medical assessment finding Plaintiff was significantly limited in her ability to sit, stand, walk, and do other activities (*see* R. at 1227–28), based only on her treatment of Plaintiff's diabetes and no review of other medical records, is inconsistent with the medical record and Dr. Ferenczi's own treatment notes that indicate Plaintiff's diabetes was well controlled. These inconsistencies are specific and legitimate reasons, supported by substantial evidence, for the ALJ to reject Dr. Ferenczi's medical opinion. As noted, the Court need not assess every reason the ALJ provided for rejecting Dr. Ferenczi's medical opinion. *See Carmickle*, 533 F.3d at 1162.

### 3. The ALJ Erred in Rejecting Dr. Fala's Opinion

The ALJ rejected Dr. Fala's opinion because he found it was "based upon the claimant's subjective complaints, it is not consistent with [the] medical record, and is, in fact, not supported by Dr. Fala's own clinical and laboratory findings, it is contradicted by opinions from examining and non-examining physicians of record, . . . , and it is inconsistent with the claimant's activities of daily living." (R. at 39.) Dr. Fala treated Plaintiff for her chronic pain, fatigue, and fibromyalgia, among other issues. (*See, e.g.*, R. at 1113.) Dr. Fala opined Plaintiff could not regularly work a full-time job and was significantly limited in her work-related abilities, citing Plaintiff's knee pain, back pain, subjective loss of vision, and lower extremity numbness. (R. at 1212–13.) She stated her opinion of Plaintiff's limitations could reasonably be expected to result from objective, documented findings. (R. at 1213.)

The Court does not find the ALJ's reasons for rejecting Dr. Fala's opinion are specific and legitimate and supported by substantial evidence. The Court finds that the ALJ's reasoning that the opinion is contradicted by Dr. Fala's own medical findings and the medical record is not supported by substantial evidence. While Dr. Fala's treatment

notes indicate that at times, Plaintiff's weaknesses improved, this is not inconsistent with Dr. Fala's overall findings and the ALJ's own finding that Plaintiff has the severe impairments of fibromyalgia and chronic pain syndrome. (R. at 33.); *see also* Soc. Sec. Ruling, SSR 12-2p; Titles II & XVI: Evaluation of Fibromyalgia (S.S.A. July 25, 2012) ("For a person with FM [fibromyalgia], we will consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'") In addition, Dr. Fala's notes indicate Plaintiff had 0/5 strength in her lower extremities, 3/5 strength in her upper extremities (R. at 1113), and profound weakness (R. at 1143). The ALJ did not identify specific and legitimate instances in the record that contradict Dr. Fala's opinion.

The ALJ also cites to the contradicting opinion of examining physician, Dr. Levinson. Because Dr. Levinson conducted objective medical tests the other treating physicians may not have considered, he conducted independent clinical findings constituting "substantial evidence" and, accordingly, the ALJ must consider various factors to determine what weight to accord the opinion of Dr. Fala in light of Dr. Levinson's opinion that constitutes substantial evidence. *See Orn*, 495 F.3d at 632–33. "Even when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is 'still entitled to deference.'" *Id*. (citing S.S.R. 96–2p at 4, 61 Fed.Reg. at 34,491). Dr. Levinson's contradictory medical opinion is not alone enough to establish a specific and legitimate reason supported by substantial evidence to reject Dr. Fala's opinion. *See id.* at 633.

The Court also does not find the ALJ's rejection of Dr. Fala's opinion because it was "based on the claimant's subjective complaints" meets the required standard. Because there is no indication that Dr. Fala found any sign that Plaintiff was malingering or deceptive, Dr. Fala's opinion should not be rejected for believing Plaintiff's complaints. *See Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1200 (9th Cir. 2008) (citing *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1300 (9th Cir. 1999)) (substantial evidence did not support ALJ's finding that examining psychologists took

claimant's "statements at face value" where psychologists' reports did not contain any indication that claimant was malingering or deceptive).

Finally, the Court rejects the ALJ's basis for rejecting Dr. Fala's opinion because it is inconsistent with Plaintiff's activities of daily living. The ALJ does not cite to any specific activity that conflicts with Dr. Fala's opinion. Moreover, Defendant stated in its Brief that because the ALJ provided multiple reasons for rejecting the doctors' opinions, it would not defend the ALJ's finding regarding daily activities. (Doc. 21.)

In sum, the Court finds none of the ALJ's reasons for rejecting Dr. Fala's opinion were specific and legitimate and supported by substantial evidence. *See Bayliss*, 427 F.3d at 1216. Accordingly, the ALJ erred in rejecting Dr. Fala's opinion.

**B.     The ALJ Did Not Err in Finding Plaintiff Not Fully Credible and Discounting the Observations of Plaintiff's Spouse**

Plaintiff argues that the ALJ erred in finding Ms. Franco not fully credible. (Pl.'s Br. at 22.) "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Although the ALJ stated Plaintiff's hearing testimony was somewhat exaggerated and she exhibited somewhat malingering behavior at a consultative exam, the ALJ did not make an explicit finding of malingering. (*See* R. at 36–37.) The Court need not determine whether the ALJ made an affirmative finding, however, because he provided clear and convincing reasons for rejecting Plaintiff's symptom testimony.[1] In his decision, the ALJ provided a detailed review of the medical record. He cited to the record and pointed to various medical exams that, contrary to Plaintiff's testimony of constant pain and incidents of vomiting and diarrhea, indicated normal findings and no significant

---

[1] The Court does not consider whether each individual reason the ALJ cites for finding Plaintiff not credible meet the clear and convincing standard, but does find that, taken as a whole, the reasons provided meet the standard and that any reason relied upon that did not meet the standard amounts to harmless error. *See Carmickle*, 533 F.3d at 1162.

- 17 -

1 medical issues that would cause symptoms to the extent Plaintiff testified. (*See* R. at 36–
2 39.) For example, the ALJ noted that physical exams in 2012 showed good strength in
3 Plaintiff's extremities, that Plaintiff could ambulate, normal visual findings, normal nerve
4 conduction findings, and an unremarkable MRI and spinal tap. (R. at 37.) The ALJ also
5 noted that doctors reported Plaintiff's diabetes was controlled and that MS could not be
6 confirmed. (R. at 37.) In addition, the ALJ relied on Dr. Levinson's report that Plaintiff
7 exhibited somewhat malingering behavior at her consultative exam. (R. at 36.) The Court
8 finds that the ALJ's review of and citation to various instances in the medical record that
9 indicate Plaintiff had normal test results and was observed without limitations to the
10 extent she testified to, satisfied the clear and convincing standard required for the ALJ to
11 find Plaintiff less than credible. *See Robbins*, 466 F.3d at 883.

12 Plaintiff also argues that the ALJ erroneously failed to consider the third party
13 observations of her husband, Mr. Franco. (Pl.'s Br. at 24–25.) First – contrary to
14 Plaintiff's assertion – the ALJ's decision states he considered Mr. Franco's statement and
15 provides an analysis of such. (R. at 39.) Second, the ALJ found that Mr. Franco's
16 statements were consistent with Plaintiff's alleged limitations, but that they did not
17 support a finding that Plaintiff is ultimately disabled. (R. at 39.) Because Mr. Franco's
18 statements are consistent with and do not add to Plaintiff's own testimony, which the ALJ
19 considered, Mr. Franco's statements were inconsequential to the ultimate determination
20 as to whether Plaintiff was disabled. Thus, the Court finds no reversible error even if the
21 ALJ did not consider Mr. Franco's statement. *See Molina v. Astrue*, 674 F.3d 1104, 1115
22 ("ALJ would have reached the same result absent the error").

23 **C.    The Credit-As-True Rule Does Not Apply**

24 Plaintiff asks that the Court apply the "credit-as-true" rule which would result in
25 remand of Plaintiff's case for payment of benefits rather than remand for further
26 proceedings. (Pl.'s Br. at 25–27.) The credit-as-true rule only applies in cases that raise
27 "rare circumstances" which permit the Court to depart from the ordinary remand rule
28 under which the case is remanded for additional investigation or explanation. *Treichler v.*

*Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099–1102 (9th Cir. 2014). These rare circumstances arise when three elements are present. First, the ALJ fails to provide legally sufficient reasons for rejecting medical evidence. *Id*. at 1100. Second, the record must be fully developed, there must be no outstanding issues that must be resolved before a determination of disability can be made, and further administrative proceedings would not be useful. *Id*. at 1101. Further proceedings are considered useful when there are conflicts and ambiguities that must be resolved. *Id*. Third, if the above elements are met, the Court may "find[] the relevant testimony credible as a matter of law . . . and then determine whether the record, taken as a whole, leaves 'not the slightest uncertainty as to the outcome of [the] proceeding.'" *Id*. (citations omitted).

In this case, the ordinary remand rule, not the credit-as-true rule, applies. Because the ALJ rejected Dr. Fala's medical opinion without sufficient justification, this case still involves evidentiary conflicts that must be resolved, and there is still uncertainty as to the outcome of the proceeding.

**IT IS THEREFORE ORDERED** affirming in part and reversing in part the decision of the Administrative Law Judge (R. at 26–47), as upheld by the Appeals Council on December 15, 2014 (R. at 1–6). The Court affirms the decision of the Administrative Law Judge as to all issues except the rejection of Dr. Fala's medical opinion. The Court remands this matter for further proceedings as to Dr. Fala's medical opinion.

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment accordingly and close this matter.

Dated this 29th day of March, 2016.

_____
Honorable John J. Tuchi
United States District Judge